

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-76,810

**RODERICK HARRIS, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. F09-00409 IN THE CRIMINAL DISTRICT COURT NUMBER 7 DALLAS COUNTY

**COCHRAN, J., delivered the opinion of the unanimous Court.**

## O P I N I O N

In May 2012, a jury convicted Roderick Harris of capital murder for the shooting death of Alfredo Gallardo during a home-invasion robbery.[1]  Based on the jury's answers to the special issues set out in Texas Code of Criminal Procedure Article 37.071, the trial judge

---

[1] TEX. PENAL CODE § 19.03(a)(2).

sentenced Harris to death.[2]  After reviewing Harris's 132-page brief on direct appeal, which sets out forty points of error, we conclude that his claims are without merit.[3]  Accordingly, we affirm the trial court's judgment.

**Factual Background**

On the evening of March 17, 2009, appellant robbed the Gallardo family in their east Dallas mobile home.  He held three adults, one teen-age girl, and two boys at gunpoint.  During the robbery, he shot and killed the father, Alfredo, and his brother, Carlos.

The evidence showed that, at about 9:00 p.m. on St. Patrick's Day, Alfredo was at home with his wife, Maria, his brother, Carlos, a son, a grandson, and his thirteen-year-old daughter, Yahaira.  Alfredo was about to go out to look for Yahaira's older sister when a "black guy" burst through the door and pointed his gun at Alfredo's head.  Yahaira was "shocked" and "scared," the more so when the man–appellant–told her, "Come here, bitch."  Yahaira's mother started to cry as appellant pointed his gun at them and, in a loud voice, asked for money, jewelry, and drugs.  Yahaira translated appellant's demands for her parents because they did not speak much English.  She took her mother's purse from the counter and gave appellant all of the money inside–two dollars.

Yahaira's father was sitting on the sofa, but when he started to stand up, appellant hit him so hard in the face with the back of his gun that his cheek started bleeding.  Then, when

---

[2] TEX. CODE CRIM. PROC. art. 37.071 § 2(g).

[3] *See* Judge Alex Kozinski, *The Wrong Stuff*, 1992 BYU L. REV. 325, 327.

Carlos tried to get his wallet out of his pocket, appellant hit him near the eyebrow with the gun. Carlos also started bleeding. Appellant told Alfredo and Carlos to get down on the floor, and then, still pointing his gun at them, appellant took their wallets from their pants pockets.

Then he took everyone to the master bedroom, and Yahaira handed him the little bit of jewelry–a necklace and two rings–that they had. Appellant pushed them all through the bathroom and toward a closet, still pointing his gun at them. He told Yahaira to tie her uncle's hands with some belts while he tied her father's hands. He was shouting at them as he kept trying to close and lock the closet door, and Yahaira's mother was crying. Yahaira thought, "We were going to die." Appellant then asked for the keys to their red truck, but Yahaira told him that her brother Omar had them and that he was at a party.[4]

Appellant "told us like, what kind of family like us didn't have money? And that if we didn't have money, we should do like–we should do what he did; that he didn't hurt people, he just robbed houses." Then he pointed to Yahaira's mother and said that she was to go with him because "he wanted to take her." She was crying and praying in Spanish, so appellant pointed at Yahaira and said that he was going to take her instead. When Yahaira's mother kept crying, appellant finally pointed his gun at Alfredo while telling Yahaira's

---

[4] Yahaira knew that Omar was in his room in the house, but she didn't want appellant to find him. Unbeknownst to Yahaira, Omar had heard his father speaking in a "panicked" voice from the living room, so he peeked out the door of his bedroom and saw appellant pointing a gun at his father's head. Omar quietly closed and locked his bedroom door, climbed out the bedroom window, and found the security guard for the mobile-home park. The security guard called 911 after Omar told him about the ongoing robbery at his home.

mother to calm down or he would "hurt" them. Yahaira thought he would shoot them.

Then appellant grabbed Alfredo's shirt and started walking him toward the restroom, but they fell on top of the Jacuzzi "and that's when the shooting came out[.]" Appellant shot Alfredo in the face and chest. Then Carlos, Yahaira's uncle, got up as if he were trying to help, and appellant shot him in the face and shoulder. Yahaira and her mother were crying on the floor of the closet when Yahaira felt the wind from another bullet pass by her. She thought appellant had fired a total of about six bullets.

Yahaira looked back out to the bathroom and saw appellant push "my dad off of him like he was disgust[ed], because of the blood." He finally ran out the door. Yahaira heard "snoring" sounds from either her father or her uncle lying on the floor and saw her father shaking. Finally, a policeman ran in and took them out of the house.[5]

Appellant had killed both Alfredo and Carlos.

During the punishment phase, the State offered evidence of several other aggravated robberies, including another capital murder, that appellant had committed during the month before the charged capital murder. On February 15, 2009, appellant and his cohort confronted Luis Gonzalez at his apartment door, forced him inside, tied him up, and robbed him of his wallet with $450 in it, his watch and shoes, a set of wheel rims, a stereo, and his

---

[5] The police responded immediately to the security guard's 911 call and were surrounding the Gallardo's home when appellant shot Alfredo and Carlos. One officer heard five shots and shortly thereafter, appellant came running outside. When the officers saw him, they yelled, "Police," and told appellant to get down on the ground. He didn't. Instead, he shot at them. As he ran toward the back of the trailer, he bumped into one officer, who then shot appellant in the back and leg.

friend's wallet, which was hidden in the sofa, with $900 in it.  Then they dragged Mr. Gonzalez into the bedroom while they ransacked his apartment.  Mr. Gonzalez managed to untie himself while appellant and his fellow robber were carrying items out to their car, and he ran and locked them out of his apartment.  Appellant started beating on the door, saying, "[O]pen the door, you son-of-a-you-know-what."  Mr. Gonzalez did not open the door, but he couldn't call the police because appellant had stolen his cell phone.  The robbers finally left in appellant's car.  Appellant's DNA was on a glove left at Mr. Gonzalez's apartment.

At about 10:30 p.m. on March 3, 2009, Karen De La Cruz Espinoza was walking through the parking lot of her apartment complex with her eleven-year-old son when she saw three black men coming hurriedly toward her.  As she got to her front door, one of them–appellant–pushed open the door and shoved her and her son inside.  Her husband and three of her four other children were already inside.  The robbers immediately closed all of the shades, pointed their guns at the heads of two of her children, and told Karen that they wanted her handbag with money and that "if we didn't give them what they wanted, that they were going to kill us all."   One of the robbers went to the back room, grabbed Karen's husband, pulled him into the living room, and threw him on the floor.

The robbers then ransacked the bedrooms, pulling out all of the drawers and emptying the contents on the floor and beds.  They took Karen's wallet with her paycheck in it, as well as her husband's wallet, her watch, an Xbox, DVDs, and other items.  As two of the robbers started taking items down the stairs, Karen heard several shots and thought that the robbers

had "found someone else" to hurt. The third robber immediately picked up the rest of the bags of property that they had collected, but Karen rushed forward, pushed him out the door, and locked it. They all stood back from the door because they were worried the robber would start shooting through it.

Appellant then went to another apartment at the complex, that of Roberto Ramos. Roberto's 27-year-old brother, Eustacio, heard a commotion in the hallway while he was in the bathroom talking on the phone to his grandmother in Mexico. When he looked out, he saw Roberto struggling with appellant, who had gotten inside the apartment. Roberto was trying to push him back outside, but appellant was too big and strong. When Eustacio went to help Roberto, appellant shot Eustacio in the chest from about four feet away. Roberto cried, "Oh, he shot you, he killed you, he hit you in the heart." Eustacio was "stunned" and fell backwards as he saw his brother struggling with appellant. Eustacio said, "I heard a shot and then a moment later, seconds later, I heard another shot. And I was saying, oh, God, and I was screaming to my brother. After that, I didn't know anything else."

A third brother, Martin, came into the living room and saw Roberto struggling with appellant, but when Martin came toward the door, appellant reached over Roberto's shoulder and shot him in the face. Then, as another neighbor watched from his door, Roberto "bearhugged" appellant who then shot Roberto three times–in the upper back, in the mouth, and in the left thigh. Roberto died in the apartment breezeway, but his two brothers, Eustacio and Martin, survived. Roberto's thirteen-year-old daughter, Jasmine, called 911 and then

found her dead father outside: "I told him I loved him and I kissed him on his cheek." The robbers escaped.

The State also offered evidence of appellant's youthful conduct: He was assigned to a behavioral adjustment classroom for disruptive students when he was in middle school. A school resource officer testified that appellant had a poor reputation for being peaceful and law-abiding at age fourteen and recalled an incident in which appellant became "combative" when his mother reported him as a run-away. In high school, he carried a knife with a six-inch blade to school. When it was discovered, he was arrested. He was arrested the next year for possession of marijuana.

Appellant had numerous gang tattoos on his body, including "HUSTLA" on his right forearm. The State's gang expert explained that this tattoo indicated that appellant is "hustling for his money. He is hustling in life. He is hustling to get ahead," usually by selling narcotics. He also had a "Fish Trap" tattoo, stars, and the numbers 212 and 3500, which indicate that appellant is a Fish Trap Bloods gang member. The expert said that the Fish Trap Bloods are a particularly violent gang known for "murders, aggravated robberies, narcotics selling, assaults, home invasion robberies. You name it, they have done it."

The State also called several police officers who testified that they had arrested appellant in Dallas for various offenses: on December 5, 2002, for unauthorized use of a motor vehicle; on December 23, 2003, on warrants for probation violation and burglary; on September 20, 2006, for traffic violations in which he was later charged with being a felon

in possession of a firearm; on April 17, 2007, for unauthorized use of a motor vehicle; and on December 27, 2007, for possession of marijuana.

In his punishment case, appellant called four family members to testify to his family history, youth, education, and good character. They said that appellant was diagnosed with attention deficit disorder at age six or seven and that he was placed in special education classes because of his behavioral problems. When he was young, appellant set a room of his family's house on fire. Family members testified that appellant's mother, who suffers from manic depression and schizophrenia, gave him insufficient attention and affection when he was young. By the time he was eleven or twelve, he was helping to care for his two younger brothers and protecting them from his parents' violence and fighting.

Appellant started using drugs–alcohol, marijuana, and PCP–when he was young. He would become paranoid and hear voices when he used drugs. Appellant has three children. While in jail awaiting trial, appellant told the mother of one of his children–who had accused him of not "caring" or he would not have put himself in his present situation–that he had "motherfucking bills to pay." In another phone call, appellant told a friend that when he got to prison he would "put bread in his pocket" and continue "the hustle." He was already running the jail tank by bullying other inmates and using their commissary funds.

## Sufficiency of the Evidence

### A.    Sufficiency to prove capital murder

In his fifteenth point of error, appellant claims that the evidence was legally

insufficient to prove that he committed capital murder–an intentional killing in the course of committing robbery–as opposed to plain murder and an unrelated theft.  Appellant first argues that there was no nexus between the two: "There is nothing in the record to indicate that Appellant went to the [Gallardo's] house to murder the Complainant in order to rob him."[6]  Second, appellant argues that he did not act with the specific intent to kill Alfredo; rather, appellant's gun "went off" when Alfredo fell against him (or pushed him), and the two fell into the Jacuzzi.

When reviewing the sufficiency of evidence, we consider all of the evidence in the light most favorable to the jury's verdict and decide whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[7]  This standard "recognizes the trier of fact's role as the sole judge of the weight and credibility of the evidence after drawing reasonable inferences from the evidence."[8]  Therefore, on appellate review, we determine whether the necessary inferences made by the trier of fact are reasonable based on the "cumulative force of all of the evidence."[9]  We conduct this review by measuring the evidentiary sufficiency with "explicit reference to the substantive elements

---

[6] Appellant's Brief at 90.

[7] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011).

[8] *Adames,* 353 S.W.3d at 860.

[9] *Id.*

of the criminal offense as defined by state law."[10]

Under Texas law, a person commits capital murder if he (1) intentionally commits murder (2) in the course of committing or attempting to commit robbery.[11]  A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.[12]  Intent to murder can be proven through circumstantial evidence of the defendant's acts and words surrounding the crime.[13]  In a capital-murder case based on a robbery, there is no requirement that the intent to cause death be premeditated before the robbery.[14]  Instead, the intent may be formed when the murder is actually committed.[15]  "The jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon."[16]

The jury could infer appellant's intent to kill Alfredo Gallardo at the moment that he pulled the trigger of his gun, from the evidence of appellant's acts, words, and conduct

---

[10] *Jackson*, 443 U.S. at 324.

[11] TEX. PENAL CODE § 19.03(a)(2).

[12] *Id.* § 6.03(a).

[13] *Ex parte Weinstein,* 421 S.W.3d 656, 668 (Tex. Crim. App. 2014).

[14] *Rousseau v. State,* 855 S.W.2d 666, 674 (Tex. Crim. App. 1993).

[15] *Id.*

[16] *Jones v. State,* 944 S.W.2d 642, 647 (Tex. Crim. App. 1996). *See also Godsey v. State,* 719 S.W.2d 578, 580-81 (Tex. Crim. App. 1986).

during the home invasion, including the following:

- Appellant burst into the Gallardo's home at night brandishing a Glock pistol which he then pointed at Alfredo's head;

- He began demanding money and jewelry while threatening with his gun;

- He hit both Alfredo and Carlos in the face with that gun;

- He took their wallets while pointing his gun at them;

- He pointed his gun at Yahaira and called her a "bitch";

- He moved the family through the house while pointing his gun at them;

- He was angry and threatening throughout the robbery and said that he would "hurt" them if Yahaira's mother did not calm down and keep quiet;

- He pulled Alfredo out of the closet by his shirt and started pushing him through the bathroom before the two men fell into the Jacuzzi;

- He immediately shot Alfredo twice: once in the head and again in the chest;[17] and

- He then immediately turned his gun on Carlos and shot him twice: once in the face and again in the shoulder.

Considering the totality of the circumstantial evidence of appellant's words, acts, and conduct, we conclude that there is sufficient evidence to prove, beyond a reasonable doubt, that appellant intended to kill Alfredo Gallardo when he shot him in the head and chest.

---

[17] Appellant argues that the evidence would support a finding that Alfredo "pushed" appellant into the Jacuzzi and that, while the two men "struggled," "the gun discharged." Appellant's Brief at 92. Although one portion of Yahaira's testimony would support such an inference, other portions of her testimony support the jury's finding that appellant immediately and intentionally shot Alfredo after they fell into the tub, and that there was no struggle. We must view the evidence in the light most favorable to the jury's verdict rather than appellant's theory. *See Adames*, 353 S.W.3d at 860.

Appellant also claims that the theft of items from the Gallardo family was just an "afterthought" to the murder. As he notes, proof of robbery "committed as an afterthought and unrelated to a murder" is not sufficient evidence of capital murder.[18] However, in this case, the evidence is clearly sufficient to prove, beyond a reasonable doubt, that appellant had the intent to commit robbery at the moment that he pushed in the Gallardo's door and began his home invasion robbery-murder. There is ample evidence of a nexus between the murder and the robbery. Indeed, there is no other rational explanation for appellant's presence in the Gallardo home at the time that he murdered Alfredo and Carlos. As appellant told them himself, if they didn't have enough money, they should do as he did – rob houses. The evidence is sufficient to prove that appellant intentionally killed Alfredo Gallardo during the robbery of the Gallardo family.[19] We overrule appellant's fifteenth point of error.

**B.    Sufficiency to prove "future dangerousness"**

In his twenty-third point of error, appellant claims that the evidence is insufficient to prove the "future dangerousness" special issue[20] because (1) there was no evidence that appellant had prior convictions for violent felonies, and (2) his witnesses testified that he essentially was a low risk for future dangerousness. The State has the burden of proving the

---

[18] *Alvarado v. State,* 912 S.W.2d 199, 207 (Tex. Crim. App. 1995); *Nelson v. State,* 848 S.W.2d 126, 131-32 (Tex. Crim. App. 1992).

[19] *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011).

[20] TEX. CODE CRIM. PROC. art. 37.071, §§ 2(b)(1), 2(c).

future-dangerousness punishment issue beyond a reasonable doubt.[21] In deciding that issue,

the jury may consider all of the evidence admitted at both the guilt and punishment stages.

Appellant relies on *Roney v. State*,[22] in which we stated,

> Although this was a senseless murder, that fact is true of every murder in the course of a robbery. The facts of this offense, standing alone, do not carry the marks of a "calculated and cold-blooded crime" . . . . To support a "yes" answer to the second punishment issue, the evidence must show beyond a reasonable doubt that there is a probability appellant would commit criminal acts of violence that would constitute a continuing threat to society. To hold that the facts of this offense, standing alone, would support such a verdict, would mean that virtually every murder in the course of a robbery would warrant the death penalty.[23]

But this jury had ample evidence, besides the double murder during the home-invasion

robbery, to support its finding that appellant would likely commit criminal acts of violence.

That evidence included the following:

- On February 15th, approximately one month before this capital murder, appellant committed another aggravated robbery at the home of Luis Gonzalez in which appellant also pointed his gun at the head of his robbery victim, demanded money, and ransacked his victim's apartment.

- On March 3rd, approximately two weeks before this capital murder, appellant committed another home-invasion aggravated robbery at the apartment of Margarito Torres and Karen De La Cruz Espinoza; appellant pointed his gun at the heads of children as he threatened to kill the family; again he ransacked

---

[21] *Russeau v. State*, 291 S.W.3d 426, 433 (Tex. Crim. App. 2009) ("[T]he State had the burden of proving beyond a reasonable doubt that there is a probability that appellant, if allowed to live, would commit criminal acts of violence, so as to constitute a continuing threat to people and property."); *Druery v. State,* 225 S.W.3d 491, 506-07 (Tex. Crim. App. 2007) (same).

[22] 632 S.W.2d 598 (Tex. Crim. App. 1982).

[23] *Id.* at 603.

their apartment and stole cash, a payroll check, a watch, and other household items.

- Immediately after that robbery, appellant tried to enter Roberto Ramos's apartment in the same apartment complex. While appellant and Roberto struggled at the door, Roberto's brother, Eustacio, came to help, but appellant shot him in the chest. Appellant shot a third brother, Martin, in the face, and then shot Roberto three times–in the mouth, upper back, and left thigh–and killed him.

Additionally, appellant had a lengthy criminal record, albeit none of his prior convictions were for violent offenses; they were for such offenses as drug possession, unauthorized use of a motor vehicle, felon in possession of a weapon, and burglary. But appellant's more recent dangerous and deadly crimes showed an escalating pattern of violence.[24] He had a long history of disruption, drugs, guns, and gang activities, which began in middle school and continued up to the time of trial, including bullying other prisoners while being held in jail before the trial began.

Viewed in the light most favorable to the jury's verdict, the evidence is sufficient to prove, beyond a reasonable doubt, that appellant would constitute a continuing threat to society.[25] We overrule appellant's twenty-third point of error.

---

[24] *Russeau*, 291 S.W.3d at 433-34 ("On this record, a rational jury could have concluded beyond a reasonable doubt that appellant exhibited a dangerous aberration of character, that he was a chronic and increasingly dangerous violator of our state's criminal laws, and that if he were allowed to live, there is a probability that he would commit criminal acts of violence in the future, so as to constitute a continuing threat to people and property."); *Swain v. State*, 181 S.W.3d 359, 370 (Tex. Crim. App. 2005) ("Both the facts of the instant offense and the other evidence showing appellant's escalating pattern of violence support a finding of future dangerousness.").

[25] *See id.*

## Jury Selection Claims

**A.    *Batson* claims**

In his first four points of error, appellant claims that the trial judge erred in overruling his *Batson*[26] challenge to four of the prosecutor's peremptory challenges used on African-Americans.  In *Batson,* the United States Supreme Court held that, while a prosecutor ordinarily may exercise peremptory strikes for any reason or no reason, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race[.]"[27]

A *Batson* challenge to a peremptory strike consists of three steps: (1) the opponent of the strike must establish a *prima facie* showing of racial discrimination; (2) the proponent of the strike must then articulate a race-neutral explanation; and (3) finally, the trial judge must decide whether the opponent has proved purposeful racial discrimination.[28]  Once the prosecutor  offers race-neutral explanations for his peremptory strikes, the burden is on the defendant to convince the trial judge that the prosecutor's reasons were not race-neutral, but were, in fact, pretextual.[29] Thus, the burden of production shifts from the defendant in step one to the State in step two, but the burden of persuasion never shifts from the defendant.[30]

---

[26] *Batson v. Kentucky*, 476 U.S. 79 (1986).

[27] *Id*. at 89.

[28] *See Purkett v. Elem,* 514 U.S. 765, 767 (1995); *Young v. State,* 283 S.W.3d 854, 866 (Tex. Crim. App. 2009).

[29] *Ford v. State,* 1 S.W.3d 691, 693 (Tex. Crim. App. 1999).

[30] *Id.*

The trial judge's ruling in the third step–whether there is proof of purposeful discrimination– must be sustained on appeal unless it is clearly erroneous.[31]

In this case, the prosecutor argued at trial that appellant did not make a *prima facie* showing that he had exercised his peremptory challenges on the basis of race, but without conceding that a *prima facie* showing had been made, he wanted to put his explanations for each of the four challenged strikes on the record.

He explained that he struck Donna Brewer because she had consistently stated, in both her questionnaire and testimony, that the death penalty is not applied fairly in Texas or Dallas. She wrote, "The death penalty is used less with majority." She then explained that she thought that "blacks and Hispanics are subject to the death penalty more than the majority" even today. She believed that there's a racial bias regarding the death penalty. The prosecutor said that the only other juror who thought that the death penalty was not fairly applied was Troy Gamble, also an African-American, and the prosecutor struck him as well. He explained that "our opinion is that if that's her belief system, then she's going to have a lot tougher time than people who don't have that belief that falls along racial lines." The trial judge denied the *Batson* challenge to Ms. Brewer.

The prosecutor explained that he struck Doris Bennett (and Troy Gamble) for the same reason that he struck two white jurors; she, like they, circled the statement that "Although I do not believe that the death penalty should ever be imposed, as long as the law

---

[31] *Grant v. State,* 325 S.W.3d 655, 657 (Tex. Crim. App. 2010) (citing *Snyder v. Louisiana,* 552 U.S. 472, 477 (2008)).

provides for it, I could assess it under the proper set of circumstances" on her questionnaire. The prosecutor said that he categorically struck all prospective jurors who circled this answer; nothing else could rehabilitate them after that answer.[32] The judge denied the *Batson* challenge to Ms. Bennett.

The prosecutor next explained that he struck Troy Gamble because he had originally agreed with the same statement as Ms. Bennett about the death penalty, but then crossed out that answer. Furthermore, he vacillated during his testimony and "basically told the State that he couldn't participate in this. He couldn't take the oath because of his feelings regarding the death penalty." And he was a track coach, a teacher, an assistant pastor, and he said that "I'm okay with regular jury service, just not a case involving the death penalty." Then, when questioned by the defense, "[h]e became a vacillating juror." Additionally, "he required a higher burden of proof, a hundred percent proof."

Finally, Mr. Gamble circled the statement that he would accept voluntary intoxication as a defense to the commission of a crime, and then scratched it out, but he did agree that "a person's use of drugs or alcohol at the time of the offense [would] automatically prevent you from assessing the death penalty if you found him guilty of capital murder." Only he and one other prospective juror–whom the prosecutor also struck–circled this statement. The prosecutor noted that he had originally challenged Mr. Gamble for cause, but that the judge

---

[32] The defense pointed out that the last alternate, Mary Wallace, also circled that statement and the prosecutor did not strike her, but as the prosecutor explained, he did not have any more strikes for the alternate jurors, so he could not strike her.

overruled that challenge.   The defense noted that the trial judge had overruled the challenge

for cause  when Mr. Gamble stated that he was "disciplined enough to answer the questions

honestly and make the right decision.  If I'm put there, I'll do what I'm supposed to do[.]"

The judge overruled the *Batson* challenge to Mr. Gamble.

The lead prosecutor said that he had struck Diane Moore, because his co-counsel had

some "unique information" about her which he would explain.  This second prosecutor

explained that Ms. Moore was the cousin of the official court reporter in another district

court, so this prosecutor asked the court reporter if there was

> anything we needed to know about this particular prospective juror who was
> her cousin, and basically informed her that, you know, this was the type of case
> where, based on the facts we had, we expected we were going to get a death
> sentence and trying to find out if she could do it.
>        The court reporter informed me that she could, but what she told me
> was that it would–it would make for interesting family gatherings, was her
> words.  And the face she made–I know her.  I've been in that court for about
> a year now.  The face she made, her expression and her demeanor and the way
> she said it, clearly, unequivocally, unambiguously told me that what she was
> saying is that it would create friction in the family when they got together if
> she went to the family saying that she had voted for a death sentence in a
> particular case.
> . . .
>        At this point, believing that we had information about her that could
> cause her pause in deliberating on this case and actually assessing the death
> penalty, we chose to exercise a strike on this.
>        And we felt like this–we felt like this family pressure could possibly be
> a situation which could influence her verdict.  It could be something that could
> affect her ability to make that decision.

The prosecutor explained that he did not ask Ms. Moore anything about her cousin or family

gatherings because he did not talk to the court reporter until after Ms. Moore had already

been interviewed by the prosecutors and defense.  And the prosecutor said that he had no reason not to trust the accuracy of the court reporter, whom he knew well.  The judge denied the *Batson* challenge to Ms. Moore.[33]

1.    *Appellant did not make a prima facie showing of racial discrimination.*

First, we agree that the defense did not make a *prima facie* showing of racial discrimination in the prosecutor's use of peremptory strikes.  Because the trial judge overruled the prosecutor's objection to that failure, the State has preserved the issue for appeal.[34]  The panel of qualified prospective jurors consisted of 38 whites, eight African-Americans, and two Asians.  The State exercised only eleven peremptory strikes in selecting the jury and then two more for the alternates.  Four of its total of thirteen strikes, or less than a third, were used on African Americans.  Appellant exercised a total of nineteen peremptory strikes with eighteen of them on whites and one on an Asian.

---

[33] On appeal, appellant lists reasons why Ms. Moore would have made an ideal juror for the State, but the issue is not whether the juror is death-qualified or even strongly in favor of the death penalty, but rather whether the prosecutor struck her because of her race.  Appellant argues that "the race neutral reason given for striking prospective juror, Diane Moore, was implausible in that it was based on a casual conversation with a distant cousin who was against the death penalty, not the prospective juror."  Appellant's Brief at 54. Indeed, the trial judge could have rejected the prosecutor's explanation as implausible, irrational, or fantastic.  But he did not.  He believed that facially neutral explanation while looking at the prosecutor and judging his demeanor and credibility.  We cannot do so on this cold record.  We must defer to the trial judge when it comes to assessing credibility.  *Purkett v. Elem*, 514 U.S. 765, 769 (1995); *Harris v. State*, 827 S.W.2d 949, 955 (Tex. Crim. App. 1992) ("Because the trial judge is able to evaluate the credibility of the witnesses at the *Batson* hearing before he makes his ruling, a reviewing court must view the record in the light most favorable to that ruling and must not disturb that ruling unless it is clearly erroneous.").

[34] *Cf. Chambers v. State,* 866 S.W.2d 9, 23 (Tex. Crim. App. 1993) (when the prosecutor did not object to the trial judge's failure to rule on the defendant's *prima facie* case, that issue became moot and could not be raised on appeal).

The final jury was composed of eight whites, three African-Americans, and one Asian, with one white and one African-American alternate jurors.    While 16.7% of the qualified prospective jurors were African-American, 25% of the final jury was African-American, as were 50% of the alternates.

Appellant argues that he may rely solely on the fact that the State struck half or 50% of the African-American prospective jurors.[35]    But, by itself, the number of African-Americans struck by the State or the number of whites struck by the defense is an irrelevant statistic.[36] What matters is the relation between the entire qualified panel and the number of jurors of a particular race who were struck.  The panel of qualified jurors in this case was 48 persons.  Of these 38 (79%) were white, eight (or 17%) were African-American, and two (or 4%) were Asian.  If the twelve jurors and two alternates were chosen at random out of the 48, one would expect that either two or three black jurors would be selected (17% of fourteen; the same ratio as African-Americans to the entire jury panel).  In this case, four African-Americans were among the twelve jurors and two alternates, which is more than

[35] Appellant struck 50% of the Asians on the panel, but there is little significance to that statistic because there were only two Asians on the panel to begin with.

[36] See *Woodward v. Epps*, 580 F.3d 318, 339 (5th Cir. 2009) (although State struck 100% of the black jurors, that fact alone does not support a finding of discrimination); *Medellin v. Dretke,* 371 F.3d 270, 278 (5th Cir. 2004) ("For the statistical evidence to be relevant, data concerning the entire jury pool is necessary. The number of strikes used to excuse minority and male jury members is irrelevant on its own."). *Cf. United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir. 1991) ("[T]he prosecution's challenge rate against minorities was 50 percent (three of six) in the selection of the jury of 12, and 57 percent (four of seven) in the selection of the jury of 12 plus alternates. Whether this rate creates a statistical disparity would require knowing the minority percentage of the venire; for example, if the minority percentage of the venire was 50, it could be expected that a prosecutor, acting without discriminatory intent, would use 50 percent of his challenges against minorities.").

would be expected by random selection.[37]  The State did not use a disproportionate number

of peremptory strikes to exclude African-Americans.  We find that appellant has not made

a *prima facie* showing of racial discrimination under *Batson*.

2.      *The prosecutors gave race-neutral explanations for their strikes.*

However, even if we concluded that appellant had made such a showing, we agree

with the trial judges[38] that the prosecutors gave racially neutral explanations for their strikes

and that appellant failed in his ultimate burden in proving purposeful racial discrimination.

The State's burden at the second stage of a *Batson* claim is to merely present a facially

valid, race-neutral explanation for its strikes.[39]  As noted above, the prosecutor gave race-

---

[37] *Cf. Watkins v. State*, 245 S.W.3d 444, 451-52 (Tex. Crim. App. 2008) ("[O]f the first thirty-seven prospective jurors—those who were 'in range' to be chosen as jurors or as the alternate juror—22% (or eight divided by thirty-seven) were African–American.  A random selection would be expected to yield 2 or 3 (or 22% of 12 total jurors, plus one alternate) African–Americans on the [defendant's] jury. Instead, only one (8% of 12 total jurors, plus one alternate) was originally selected. Moreover, the State used 55% of its peremptory challenges (six of eleven) to exclude 88% (seven of eight) of the African–Americans from the prospective jury pool. Clearly, the State used a disproportionate number of its peremptory challenges (55% of its challenges against an identifiable racial group that made up only 22% of the venire that was 'in range') to exclude almost all of the African–American veniremen from jury service in [defendant's] case.").

[38] Actually, four different judges (Judges Biard, Parker, Fry, and Snipes) were involved in the *Batson* hearing because four different judges participated in the jury selection and trial.

[39] *Purkett v. Elem*, 514 U.S. 765, 769 (1995) ("The prosecutor's proffered explanation in this case–that he struck juror number 22 because he had long, unkempt hair, a mustache, and a beard–is race neutral and satisfies the prosecution's step two burden of articulating a nondiscriminatory reason for the strike."); *Watkins*, 245 S.W.3d at 447 ("At the second step of this process, the proponent of the strike need only tender an explanation that is race neutral on its face. The ultimate plausibility of that race-neutral explanation is to be considered as part of the third step of the analysis, in which the trial court determines whether the opponent of the strike (usually the defendant) has satisfied his burden of persuasion to establish by a preponderance of the evidence that the strike was indeed the product of the proponent's purposeful discrimination.").

neutral explanations for each of his strikes of African-American venirepersons.  Although appellant questioned the validity of some of those explanations (for example, he argued that Ms. Brewer was correct in thinking that the death penalty was unfairly applied in Texas), he failed to show that the prosecutors' explanations were not race-neutral or were pretextual.

A prosecutor's explanation that he exercised a strike based on a venireperson's opinion about the death penalty is facially race-neutral.[40]  Similarly, a prosecutor's explanation that a juror would hold the State to a burden of proof higher than beyond a reasonable doubt is race-neutral.[41]  And a prosecutor's explanation that a potential juror's participation in the case might cause friction within her own family[42] is a facially race-neutral explanation, even if it is a "silly or superstitious" one.  The issue at stage two of a *Batson* challenge is not the *reasonableness* of the explanation, but its *genuineness*.[43]  A race-neutral explanation need not be persuasive or even plausible to satisfy stage two of *Batson*.

3.      *Appellant did not carry his burden to prove purposeful discrimination.*

It is the trial judge's role, at stage three, to assess the plausibility or persuasiveness of

---

[40] *See Mathis v. State*, 67 S.W.3d 918, 924-25 (Tex. Crim. App. 2002) (prosecutor's explanation that he struck a juror because she felt that the death penalty was imposed too frequently was a race-neutral explanation).

[41] *See Watkins*, 245 S.W.3d at 450-51.

[42] The prosecutor seemed to imply that the juror might also cause friction on the jury.

[43] *See Elem,* 514 U.S. at 768-69 (a second-stage race-neutral explanation need not be "a reason that makes sense," but simply a reason that does not deny equal protection; a race-neutral explanation that is "silly or superstitious" satisfies the second stage  of *Batson*, though a trial judge "*may choose to disbelieve* a silly or superstitious reason" at the third stage).

the explanation.[44] Thus, "[i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed."[45] Because the evidence on the credibility of the prosecutor's explanation is often vague or ambiguous, "the best evidence often will be the demeanor of the attorney who exercises the challenge."[46] Thus, "evaluation of the prosecutor's state of mind based on [his] demeanor and credibility lies 'peculiarly within a trial judge's province.'"[47] The Supreme Court has instructed us to accord "great deference" to the trial judge's findings in this context,[48] and appellant has failed to persuade us that the four judges supervising the *Batson* challenges in this case erred in their credibility assessment.[49] The trial judges found that appellant had failed to prove that the prosecutors purposefully discriminated against any of

---

[44] *Id.* at 768 ("It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.")

[45] *Hernandez v. New York*, 500 U.S. 352, 365 (1991).

[46] *Id.*

[47] *Id.* (quoting *Wainwright v. Witt,* 469 U.S. 412, 428 (1985)).

[48] *Batson*, 476 U.S. at 98 n.21.

[49] *See Herron v. State*, 86 S.W.3d 621, 630-31 (Tex. Crim. App. 2002) ("Because the trial court's decision often turns largely on an evaluation of credibility, we give the court's decision great deference and will not disturb it unless it is clearly erroneous"; deferring to trial judge's finding that prosecutor's explanation that he struck potential juror the D.A.'s investigator said "ha[d] a chip on her shoulder" and had a reputation at work for being close-minded; because the explanation was a race-neutral one that the defendant failed to rebut, the trial judge did not clearly err in denying *Batson* challenge); *see also Grant v. State*, 325 S.W.3d 655, 658-60 (Tex. Crim. App. 2010) (record supported trial judge's finding of no pretext when prospective juror listed his spouse's employer as the Wal-Mart return center where prosecutors believed that the defendant's girlfriend had been employed).

the four jurors on the basis of race. We conclude that their conclusion is not clearly erroneous.[50] We therefore overrule appellant's points of error one through four.

## B.    Denial of appellant's challenges for cause

In points of error five through ten, appellant claims that the trial judge violated his constitutional and statutory rights by denying him challenges for cause against six potential jurors–Lynda Waters, Allen Gooch, Virginia Day, Matthew Smith, David Calvery, and an alternate, Kimberly Thomas.[51] Appellant argues that these purported errors required him to use peremptory strikes against each of the jurors and forced him to accept an objectionable juror whom he would have struck had he not used up all of his peremptory strikes and the two additional strikes that the trial judge granted him. However, David Calvery, the juror who appellant claimed was objectionable and whom he would have struck if he had an additional strike, was removed from the jury before the deliberations began, and an alternate took his place. Therefore, appellant has not shown that he was harmed by the trial judge's denial of these five challenges as no objectionable juror participated in the deliberations.[52]

---

[50] *Herron*, 86 S.W.3d at 630.

[51] Because the trial judge granted appellant an extra peremptory challenge for the alternate jurors and appellant used that additional peremptory challenge to remove Ms. Thomas as an alternate, his claim is moot, and he has not shown harm.

[52] *See Saldano v. State*, 232 S.W.3d 77, 91 (Tex. Crim. App. 2007). As we explained, Harm from the erroneous denial of a defense challenge for cause occurs: (1) when a defendant uses a peremptory challenge to remove a veniremember whom the trial court should have excused for cause at the defendant's request, (2) the defendant uses all of his statutorily allotted peremptory challenges, and (3) the defendant unsuccessfully requests an additional peremptory challenge which he claims he would use to remove another veniremember whom the defendant identifies as

Furthermore, appellant was granted two additional peremptory challenges, so he would have to show that the trial judge erred in denying at least three of his challenges for cause before he could establish harm, even if the "objectionable juror," Mr. Calvery, had actually served on the jury during deliberations.[53]

Finally, appellant has not established that the trial judge erred in denying any of the challenges for cause. We review the trial judge's ruling with "considerable deference" because he is "Johnny-on-the-Spot" and in the best position to evaluate the venireman's demeanor, attitude, and tone of voice.[54] We grant the trial judge particular deference when the prospective juror's answers are "vacillating, unclear or contradictory."[55]

Appellant argues that his challenge to Lynda Waters should have been granted because (1) she failed to "under[stand] the issues"; (2) she did not have sufficient "gravity" and respect for a death penalty case; and (3) she was disrespectful toward counsel. The State counters that, once the law was explained to her, Ms. Waters understood that the State was required to prove intent to kill and that she would hold the State to that burden. Concerning

---

"objectionable" and who actually sits on the jury. When these conditions are met, this Court has stated that the trial court's erroneous denial of a defense challenge for cause harms the defendant by wrongfully depriving him of at least one of his statutory peremptory challenges that he could have used to remove the juror whom the defendant identifies as "objectionable."

*Id.* (citations omitted).

[53] *Id.*

[54] *Id.*

[55] *Threadgill v. State*, 146 S.W.3d 654, 667 (Tex. Crim. App. 2004); *Feldman v. State*, 71 S.W.3d 738, 744 (Tex. Crim. App. 2002).

her lack of "gravity," the trial judge noted that he did hear her giggling at one point, "but I–I didn't think it was inappropriate. . . . I think she was trying to be responsive." She had a little difficulty understanding some of the concepts, but "she kept reiterating the fact that she could be fair, that she could listen to the evidence, . . . and that she would make her decisions based on the evidence and the law." He did not believe that she was disrespectful of either the process or defense counsel. The trial judge was in the best position to evaluate Ms. Walter's responses, her understanding of the law, as well as her attitude and demeanor.[56] We overrule appellant's fifth point of error.

Appellant challenged Allen Gooch, claiming that he did not understand the first special issue and because he was argumentative, disrespectful, and openly hostile to defense counsel. The record reflects that the prosecutor discussed the first special issue with Mr. Gooch extensively and that he repeatedly said that he understood the purpose of the issue and could follow the law concerning that special issue. He would not automatically answer that issue, and he was "not leaning toward anything." The trial judge also noted that Mr. Gooch "was frustrated [with defense counsel] at times, but . . . [h]e understood to keep an open mind, hear all the evidence, then make his decision based upon all the evidence presented to him[.]" Again, the trial judge was in the best position to evaluate Mr. Gooch's responses and his understanding of the law, as well as his attitude and demeanor.[57] We

---

[56] *Feldman*, 71 S.W.3d at 744.

[57] *Id.*

overrule appellant's sixth point of error.

Appellant challenged Virginia Day, arguing that she would automatically answer special issue number two – the mitigation special issue – "no." On appeal, appellant also claims that the trial judge improperly rehabilitated her. When questioned by the prosecutor, Ms. Day repeatedly indicated that she understood that she must keep an open mind, listen to the evidence, and consider all of the evidence in answering special issue number two. She said the same in answer to queries by defense counsel. After a lengthy, convoluted hypothetical question posed by defense counsel, he ended with

> –then when you get to Special Issue Number 2, while you might can look at some of these things, that your concern for the people in his society is going to be such that you could not answer that issue in a way that he would get the life penalty and be put in his society where he's going to be a danger.
>     Is that what I'm hearing you say?

Ms. Day:     That's what you're hearing me say.

Immediately after that answer, appellant passed Ms. Day and challenged her for cause. Given the ambiguous question and answer, the trial judge questioned Ms. Day himself to make sure that she understood the law concerning the second special issue and then asked her, point-blank, if she could follow that law as she had repeatedly told the prosecutor. Once again, she told the trial judge that she understood the law and could follow it. Defense counsel then declined to ask any additional questions. Ms. Day was perhaps simply confused by defense counsel's question; at worst, she was a vacillating juror. When the record reflects that a prospective juror vacillated or equivocated on her ability to follow the law, we must

defer to the trial judge's determination.[58]  We overrule appellant's seventh point of error.

In his eighth point of error, appellant claims that the trial judge erred in overruling his challenge for cause against Matthew Smith because Mr. Smith stated that he would not consider appellant's evidence of physical violence in his family as being mitigating.  He was not required to.  A venireman is not challengeable for cause on the ground that he would not consider a specific type of evidence to be mitigating.[59]  Mr. Smith understood that each juror decides what is mitigating, and he explained that he could consider a wide variety of mitigating evidence, including evidence of intoxication.  But he did not place a lot of weight on some evidence, such as whether the person was abused as a child or his parents were not there for him.  Mr. Smith said, "Well, I'm sorry,  that's terrible, but [the person] made the choice to commit this crime."  Mr. Smith said that he would consider all of the evidence.  Merely because he did not consider violence in the home, poverty, or abandonment to be mitigating did not make him subject to a challenge for cause.  The trial judge did not abuse his discretion in denying the challenge, and we overrule appellant's eighth point of error.

In his ninth point of error, appellant claims that the trial judge erred in denying his challenge for cause of David Calvery.  But Mr. Calvery was removed from the jury before deliberations began.  We have explained that when an objectionable juror is seated on the

---

[58] *Gardner v. State*, 306 S.W.3d 274, 295 (Tex. Crim. App. 2009).

[59] *Joubert v. State*, 235 S.W.3d 729, 734 (Tex. Crim. App. 2007).

jury but does not participate in jury deliberations, a defendant has not been harmed.[60]  We

overrule appellant's ninth point of error.  We reject appellant's tenth point of error based on

the reasons set out in note 51.[61]  Because (1) no objectionable juror deliberated in appellant's

case, (2) none of his claims concerning the challenges for cause had merit, and (3) no

erroneous ruling caused harm, we also reject appellant's contention, in his eleventh and

twelfth points of error, that he was deprived of a lawfully constituted jury because of the

wrongful denial of his challenges for cause.[62]  We conclude that none of his jury selection

claims have merit.

**Trial Issues**

In his thirteenth point, appellant claims that the trial judge erred in denying his motion

for mistrial when one juror (David Calvery) read a newspaper article about the trial and told

other jurors that he had done so.  We conclude that the trial judge did not abuse his discretion

in denying appellant's mistrial motion.

The guilt stage of appellant's trial began on May 8th.  The trial judge had repeatedly

---

[60] *See, e.g., Cooks v. State*, 844 S.W.2d 697, 722 (Tex. Crim. App. 1992) (when objectionable alternate juror was not among those who actually deliberated, defendant was not harmed by trial judge's failure to grant challenge for cause).

[61] *See* note 51, *supra.*

[62] In these two points of error, appellant claims that "the jury as constituted was biased or prejudiced which deprived appellant of a fair trial." He argues that, because the trial judge overruled his challenges for cause, the jury was, *ipso facto*, prejudiced against him. Because we conclude that the trial judge did not err in overruling these challenges, we necessarily conclude that the trial judge's action did not thereby deny appellant of a lawfully constituted jury.

instructed the jurors not to read or listen to any media coverage of this case. At the end of the second day of trial, one juror, Shawn Stark, reported to the judge that a different juror had mentioned reading a newspaper article about the case. First thing the next morning, the trial judge questioned the jurors and discovered that David Calvery had told both Mr. Stark and another juror that he had read a Dallas Morning News article about the trial. Next, the trial judge, prosecutor, and defense attorney questioned Mr. Calvery, who admitted that he had read articles on both May 9th and 10th. Defense counsel asked that Mr. Calvery be dismissed and replaced with the first alternate. Everyone agreed and that was done.

Then the trial judge questioned each of the other jurors individually. Each stated that he had not read any articles or heard any news about the trial, although some had heard Mr. Calvery say that he had read a newspaper article. Both the State and defense had an opportunity to question the jurors, all of whom testified that nothing they had heard (or the circumstances of being questioned) would affect their ability to be fair and impartial in the case. All indicated that they would consider only the evidence from the witness stand in considering the case. Nonetheless, at the end of all of the individual questioning, appellant asked for a mistrial, claiming that his constitutional right to a fair and impartial jury had been violated.[63] The trial judge denied the motion.

We review the judge's ruling on a motion for mistrial under an abuse-of-discretion

---

[63] Appellant's objection was as follows: "We would ask for a mistrial in the case based on th Fifth Amendment, due process; Sixth Amendment right to a fair and impartial jury; Fourteenth Amendment, due course of law, under the Texas Constitution."

standard.[64]  A mistrial is required only in extreme circumstances for a narrow class of highly

prejudicial and incurable errors.[65]  These are errors that are so obvious and egregious that a

reviewing court would necessarily reverse any conviction on appeal.[66]  Claims asserting

prejudice from mid-trial publicity are considered by assessing two factors:

- First, the trial judge looks at the nature of the news material to determine if it is inherently prejudicial and then evaluates such matters as the timing of the coverage and its possible effects on legal defenses;

- Second, the trial judge must determine the likelihood that the publicity has, in fact, reached the jurors.[67]

Appellant claims that he was prejudiced because Mr. Calvery told the other jurors

about the content of the newspaper articles that he had read.[68]  But all of the jurors testified

under oath that Mr. Calvery did *not* tell them about the content of those two articles.  The

trial judge was entitled to believe them.  Furthermore, the two articles at issue are in the

---

[64]  *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004).

[65]  *Id.*

[66]  *Id.*

[67]  *Ladner v. State*, 868 S.W.2d 417, 423 (Tex. App.–Tyler 1993,  pet. ref'd) (noting that "[o]ur Court of Criminal Appeals has not formulated a doctrine to deal with mid-trial publicity" and adopting the federal two-pronged approach) (citing *United States v. Manzella*, 782 F.2d 533, 541-44 (5th Cir. 1986)).  *See generally,* Andrea G. Nadel, *Juror's Reading of Newspaper Account of Trial in State Criminal Case During Its Progress as Ground For Mistrial, New Trial, or Reversal*, 46 A.L.R. 4th 11 (1986 & Supp. 2014).

[68]  Appellant also claims that the trial judge's questioning of the jurors and removal of Mr. Calvery had a "chilling" effect on the jury such that he was denied a fair trial and an impartial jury. Appellant's Brief at 87.  Appellant did not object on this basis at trial–indeed he had requested that Mr. Calvery be removed from the jury–so he has not preserved this claim for appeal.

record and they reflect nothing more than what evidence had been introduced during the first two days of trial.  Because they merely repeated what the jury had already heard, appellant has failed to prove that they were prejudicial.[69]  We overrule his thirteenth point of error.

In his fourteenth point of error, appellant claims that the trial judge erred in overruling his objection to the response to a note the jury sent out during deliberations.  This note asked for a specific portion of Yahaira's testimony to be reread: "Whether or not Alfredo pushed Mr. Harris into the tub or whether they fell into the tub."  The trial judge identified the responsive portions of Yahaira's testimony, but appellant wanted to include a portion of the testimony in which defense counsel's question assumed that Alfredo pushed Mr. Harris into the tub.  The trial judge declined to include that portion of Yahaira's cross-examination because counsel's question was focused on whether Alfredo was wearing a white T-shirt when he was shot, not on whether Alfredo pushed appellant or they both fell.[70]

---

[69] *See* Andrea G. Nadel, *supra* note 67, § 2 (although ultimate decision of whether to grant mistrial when jurors have read newspaper accounts rests in sound discretion of trial judge, certain general rules apply such as "the principle that a juror's reading of a newspaper account of the trial in which he is sitting is not a ground for a new trial, mistrial, or reversal if the article contains nothing prejudicial to the defendant's case. This rule has been applied to cases where the article merely set forth an accurate and unbiased account of the occurrences which took place in the courtroom and in the presence of, or within the hearing of, the jury, it being reasoned that what the jurors already know first hand cannot affect their decisions when later brought to their attention by something they read.") (section references omitted).

[70] The trial judge read the portion of the testimony that appellant wanted to include and added his comments:

Q:    At the time your father got out of the closet with Mr. Harris and went into the bathroom, what was he wearing?
A:    It was a white T-shirt.
Q:    A white T-shirt?

When the jury sends out a note asking for certain testimony on a disputed point, the trial judge must interpret that note, decide what testimony is most responsive to the inquiry, and then limit the re-reading to that specific testimony.[71] The trial judge has great discretion in deciding what testimony is responsive to the jury's dispute, and we will not disturb his ruling unless (1) he has clearly abused that discretion, and (2) the defendant shows harm.[72]

After reviewing appellant's request, the testimony at issue, and the trial judge's explanation, we agree that the specific cross-examination that appellant pointed to was not directly responsive to the jury's request. The trial judge did not abuse his discretion in omitting it, but, even if he had abused his discretion in omitting it, appellant has failed to

---

A:      Yes.
Q:      That was a regular white T-shirt, short sleeve?
A:      Yes.
Q:      That we're all familiar with, I guess?
A:      Yes.

[Judge speaking]      And so the witness is thinking–in my judgment, she is talking about a white T-shirt.  And [defense counsel] throws in:

Q:      And at the time he pushed Mr. Harris in the bathtub and fell on top of him, was he wearing the same white T-shirt?
A:      Yes.

[Judge speaking]      So, again I don't think that is responsive to [the jury's question] at all.  And I note your objection and it is overruled.

[71] *See Brown v. State*, 870 S.W.2d 53, 55 (Tex. Crim. App. 1994); *Iness v. State*, 606 S.W.2d 306, 314 (Tex. Crim. App. 1980).

[72] *Brown,* 870 S.W.2d at 55.

show harm.[73]  We overrule his point of error fourteen.

In his point of error sixteen, appellant claims that the trial judge erred in denying his requested jury instructions that compared the "reasonable doubt" standard to those of "clear and convincing" and "preponderance of the evidence."[74]  This same claim was raised and rejected in *Mays v. State*,[75] which appellant does not cite or distinguish.  Appellant has not persuaded us that our reasoning in *Mays* was incorrect.  We overrule this point of error.

In his points of error seventeen and eighteen, appellant claims that the trial judge erred in admitting certain crime scene and autopsy photographs over his Rule 403 objection.  We disagree.  A trial judge's decision to admit photographs over a Rule 403 objection is reviewed under an "abuse of discretion" standard.[76]  Under Rule 403, all relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

---

[73] The testimony that was read to the jury included Yahaira's direct and cross-examination statements that her father pushed appellant into the tub and that they had both fallen into it.  The content that appellant wanted before the jury–that Alfredo pushed appellant into the tub–was contained in the testimony that was read to the jury, so appellant can show no harm in the trial judge's refusal to read different testimony that addresses the same point.

[74] Concerning the burden of proof, the trial judge instructed the jury as follows:
    The prosecution has the burden of proving the Defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt.  And if it fails to do so, you must acquit the Defendant.
    It is not required that the prosecution prove guilt beyond all possible doubt; it is required that the prosecution's proof excludes all reasonable doubt concerning the Defendant's guilt.

[75] 318 S.W.3d 368, 389 (Tex. Crim. App. 2010).

[76] *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Crim. App. 2001).

delay, or needless presentation of cumulative evidence."[77]  In conducting a Rule 403 analysis

concerning crime-scene or autopsy photographs,

> the trial court must consider the host of factors affecting probativeness, including the relative weight of the evidence and the degree to which its proponent might be disadvantaged without it, and balance those factors against the tendency, if any, that the photographs have to encourage resolution of material issues on an inappropriate emotional basis.[78]

If the elements of a photograph are genuinely helpful to the jury in making its decision, the

photograph is inadmissible only if the emotional and prejudicial aspects substantially

outweigh those helpful aspects.[79]

Appellant complains that the crime scene photographs were "extremely bloody" and

included close-ups of the bodies of both Alfredo and Carlos, as well as that of Roberto

Ramos, the victim in the extraneous capital murder.  The autopsy photos were also "bloody"

and showed Alfredo's "nude upper torso" and close-ups of the bullet wounds.

The crime-scene photographs were not excessive in number[80] and aided in the

---

[77] TEX. R. EVID. 403.

[78] *Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999).  The factors that a trial judge should consider include the number of exhibits offered, their gruesomeness, their detail, their size, whether they are color or black and white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case.  *See Prible v. State*, 175 S.W.3d 724, 734 (Tex. Crim. App. 2005).  "It is also relevant for the trial court to consider whether the body as photographed has been altered since the crime in some way (e.g., by autopsy) that might enhance its gruesomeness to the defendant's detriment."  *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992).

[79] *Erazo v. State*, 144 S.W.3d 487, 491-92 (Tex. Crim. App. 2004).

[80] In point of error seventeen, appellant complains of the admission of eight crime-scene photographs, while in point of error eighteen he complains of fourteen autopsy photographs.

development of the case at both the guilt stage and the punishment stage. They assisted the

police officers' testimony and their description of what they saw and did when they arrived

at the two different crime scenes. Although the photographs might show bloody bodies, they

are no more gruesome than the acts that appellant committed.[81] The trial judge did not abuse

his discretion in finding that the probative value of these crime-scene photographs was not

substantially outweighed by their prejudicial effect.[82]

Concerning the autopsy photographs, we have held that such photographs are

generally admissible unless they depict mutilation of the victim caused by the autopsy itself.[83]

The main concern is that the jury might attribute certain injuries caused by the autopsy to the

defendant, unfairly prejudicing his case.[84] If the autopsy photographs simply depict the

injuries caused by the defendant's conduct, any gruesomeness cannot be called "unfairly"

---

[81] *See Gallo v. State*, 239 S.W.3d 757, 763 (Tex. Crim. App. 2007) (photographs of deceased child victim showed only those injuries that she suffered while in defendant's care and "were no more gruesome than would be expected in this sort of crime").

[82] *See Shuffield v. State*, 189 S.W.3d 782, 787-88 (Tex. Crim. App. 2006) (trial judge did not abuse his discretion is admitting crime-scene photographs because they were probative of the crime scene and the injuries received by the victim, they were necessary in developing the State's case, and they were not overly gruesome).

[83] *Rojas v. State,* 986 S.W.2d 241, 249 (Tex. Crim. App. 1998); *Santellan v. State,* 939 S.W.2d 155, 172 (Tex. Crim. App. 1997).

[84] *See Rojas,* 986 S.W.2d at 249 (autopsy photographs were admissible because the gunshot wounds and trauma to the pelvic area that are depicted in the photographs were a result of appellant's actions, not the performance of the autopsy); *Santellan,* 939 S.W.2d at 173 (a change caused as part of the autopsy process which is of minor significance does not prevent the admission of the photograph when its disturbing nature is due primarily to the injuries caused by appellant).

prejudicial to the defendant.[85]  The trial judge did not abuse his discretion in admitting the autopsy photographs.  We overrule appellant's points of error seventeen and eighteen.

### Punishment Stage Claims

In his nineteenth point of error, appellant claims that the trial judge erred by allowing Alfredo Gallardo's family members to (1) remain in the courtroom during a portion of the punishment stage, and (2) testify in the State's rebuttal case. He relies on Rule 614 of the Texas Rules of Evidence, but does not discuss Article 36.03 of the Code of Criminal Procedure, which trumps Rule 614 and permits a victim's close family members to remain in the courtroom, even if they will be testifying, unless the defendant has made an offer of proof to justify their exclusion.[86]  Because appellant has not applied the appropriate statute to the facts,[87] he has forfeited any claim of error under Rule 614, and we overrule this point.

---

[85] *Santellan*, 939 S.W.2d at 172 (autopsy photographs "only depict the damage perpetrated by appellant.").

[86] Article 36.03(a) and (b) read as follows:

(a)     Notwithstanding Rule 614, Texas Rules of Evidence, a court at the request of a party may order the exclusion of a witness who for the purposes of the prosecution is a victim, close relative of a deceased victim, or guardian of a victim only if the witness is to testify and the court determines that the testimony of the witness would be materially affected if the witness hears other testimony at the trial.

(b)     On the objection of the opposing party, the court may require the party requesting exclusion of a witness under Subsection (a) to make an offer of proof to justify the exclusion.

[87] Under Article 36.03, appellant was required to show, with an offer of proof in the trial court, that the testimony of Maria and Yahaira Gallardo would be materially affected by the testimony of other witnesses.  Their testimony on rebuttal simply established the impact the offense had upon their family.  There is no suggestion and no proof that this testimony was, or would likely be, impacted by hearing other witnesses during the punishment phase.

In his twentieth point of error, appellant claims that the trial judge erred in overruling his objection to the State's gang expert testifying about what the tattoo "HUSTLA" means because the witness was not qualified to give such an opinion. In his twenty-second point, appellant claims that the trial judge erred in overruling his objection to Detective Nelson's testimony that appellant was associated with the "Fishtrap Bloods" gang. We conclude that the trial judge did not abuse his discretion in admitting Det. Nelson's testimony.

After the guilt stage, the trial judge conducted a *Nenno*[88] hearing outside the jury's presence to determine the admissibility of Detective Nelson's testimony. At the conclusion of that hearing, he ruled that he was going to allow the testimony.

> I conclude that the field of expertise is a legitimate one, the subject matter falls within that field, and the expert's testimony properly relies upon and/or utilizes the principles involved in the field.

The trial judge relied on *Horton v. State,*[89] which he said was "on all fours." *Horton* upheld the admission of testimony by a gang expert during the punishment stage that the defendant's tattoos showed that he was a member of the "Five Deuce Hoover Crips" and that the purpose of that gang was to engage in criminal activities that would make money for its members.[90]

Appellant has not shown that the trial judge abused his discretion in finding Det.

---

[88] *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998).

[89] No. 14-10-00253-CR, 2011 WL 742654 (Tex. App.–Houston [14th Dist.] March 3, 2011, pet. dism'd) (not designated for publication).

[90] *Id.* at *3. Although neither trial nor appellate judges should *rely* on unpublished decisions as legal authority, they may find the reasoning in such cases instructive. *See Carrillo v. State*, 98 S.W.3d 789, 794 (Tex. App.–Amarillo 2003, pet. ref'd).

Nelson qualified to testify to the meaning of "HUSTLA."[91] Det. Nelson said that he had eighteen years experience and training related to gangs, including fifteen years on the Dallas gang unit and three years in a federal unit. He was wise in the ways of the street. His factual testimony concerning gang membership and gang tattoos showed his general familiarity with this area of expertise and the prosecutor's questions were within that area of expertise. Appellant does not explain why he thinks Det. Nelson's experience was insufficient to allow him to testify to the meaning of appellant's tattoos, specifically the "HUSTLA" tattoo. Nor does he explain why the trial judge improperly followed the logic in *Horton*,[92] a case that the judge found on "all fours." We agree that the trial judge did not abuse his discretion in admitting Det. Nelson's tattoo testimony.

In his twenty-second point, appellant claims that Det. Nelson's testimony about appellant's connection to the "Fishtrap Bloods" was improper because (1) he failed to show a "proper nexus or connection to the Defendant," and (2) this testimony violated appellant's First Amendment rights of association. For this latter argument, appellant relies on two

---

[91] Detective Nelson testified that appellant's tattoo meant "hustling" and that "[h]ustling means about getting his money" by selling narcotics. "Most gang members, they're not selling cookies. They're either selling narcotics or they're jacking and robbing people."

[92] *Horton*, 2011 WL 742654 at *3; *see also Burleson v. State,* No. 02-09-178-CR, 2010 WL 1730822, *5 (Tex. App.–Fort Worth April 29, 2010, no pet.) (not designated for publication) (police officer with 17 years experience in gang unit was qualified to testify about defendant's gang membership, the activities of that gang, and defendant's tattoos and how they signified membership in the gang); *Hernandez v. State*, No. 03-04-356-CR, 2006 WL 191918, *3-5 (Tex. App–Austin Jan. 26, 2006, pet. ref'd) (not designated for publication) (upholding trial judge's decision that police sergeant and deputy sheriff were qualified as gang experts).

federal cases dealing with admission of gang evidence to prove guilt, not to assess the proper punishment.[93] Those cases are inapposite.

We have frequently upheld the admission of evidence of the defendant's gang membership and the violent activities of that gang at the punishment stage of a capital murder trial as relevant to the future dangerousness question.[94] To prove the relevance of a defendant's membership in an organization or group, the state must show: (1) proof of the group's violent and illegal activities, and (2) the defendant's membership.[95]

At the admissibility hearing, Det. Nelson's testimony showed that appellant was a member of the "Fish Trap Blood" gang based on his numerous gang-related tattoos, a drawing using symbols representative of that gang, his possession of red items (that gang's

---

[93] *See United States v. Polasek*, 162 F.3d 878, 884-87 (5th Cir. 1998) (reversing defendant's conviction for fraud by changing odometers when government offered evidence that several of defendant's former business associates had been convicted of odometer fraud; there was no evidence that defendant knew of their actions or had anything to do with them; reversible error when government sought to prove "guilt by association"); *United States v. Irvin*, 87 F.3d 860, 865-66 (7th Cir. 1996) (trial judge abused his discretion in permitting "highly charged gang affiliation" evidence, involving satanic imagery, to prove guilt when defendant was mere passenger in car containing drugs and no evidence showed that gang was involved in drug distribution).

[94] *See, e.g., Davis v. State*, 329 S.W.3d 798, 805-06 (Tex. Crim. App. 2010) (upholding the admission of evidence of defendant's membership in the Satanic religion at punishment phase of capital murder trial as that evidence was relevant to the "future dangerousness" special issue); *Batiste v. State*, No. AP-76600, 2013 WL 2424134, *5 (Tex. Crim. App. June 5, 2013) (not designated for publication) (upholding testimony of gang membership and defendant's gang-related tattoos as relevant to future dangerousness question); *Vasquez v. State*, 67 S.W.3d 229, 239-40 (Tex. Crim. App. 2002) (evidence of defendant's membership in the Mexican Mafia admissible to show motive for gang-related murder and evidence of his tattoo showed gang membership); *Mason v. State*, 905 S.W.2d 570, 577 (Tex. Crim. App. 1995) (upholding admission of gang evidence at punishment stage of capital murder trial).

[95] *Mason*, 905 S.W.2d at 577.

"colors"), and his use of a red glove. Det. Nelson's testimony also described the activities of that gang and its reputation in Dallas. We hold that the trial judge did not abuse his discretion in admitting Detective Nelson's expert testimony on gang evidence and on appellant's tattoos. We overrule points of error twenty and twenty-two.

In point of error twenty-one, appellant claims that the trial judge erred in overruling his objection to the admission of testimony about his prior criminal-trespass misdemeanor conviction from Georgia because he had waived his right to counsel in that case.[96]

At trial, appellant objected to the testimony of Christopher Arno, the complainant in the Georgia incident; on appeal he objects only to the admission of the certified copy of the misdemeanor judgment, although at trial he expressly stated that he did not have any objection to the admission of the certified judgment. Appellant all along objected only to *testimony* about the Georgia incident, not the certified judgment. Thus, appellant has not preserved any error because his objection at trial does not match his claim on appeal. Alternatively, the trial judge did not err in admitting the Georgia judgment because appellant *waived* his right to counsel; he was not *deprived* of counsel in that case. A misdemeanor conviction is not invalid or inadmissible simply because the defendant waived his right to

---

[96] Appellant's full objection was as follows:
We just wanted to reurge our objection to the witness that we anticipate the State is calling next regarding the Clayton County, Georgia offenses, as the record the State has tendered to us show our client waived his right to counsel and was not represented by a lawyer in that offense, and we would object to inclusion of any testimony regarding that offense or those incidents under the Sixth and Eighth Amendments of the United States Constitution.

counsel before entering a plea.[97] At any rate, even if the trial judge erred in admitting

testimony of the Georgia incident and the judgment of conviction, we conclude that any error

was harmless.[98] We overrule appellant's twenty-first point of error.

In his twenty-fourth point of error, appellant claims that the trial judge erred in

denying his motion to disqualify the Dallas District Attorney's Office because that office

hired appellant's former second-chair counsel as an assistant before trial. A district attorney,

not a trial judge, determines when a conflict of interest exists that requires his recusal or that

of his office.[99] Appellant suggests that we should create an exception to this general rule

because (1) this is a death case; (2) appellant's former counsel was hired after doing

extensive work for appellant; (3) appellate attorneys who would be under his former defense

counsel as head of the appellate section participated in the death-penalty case; (4) the

---

[97] *See Disheroon v. State,* 687 S.W.2d 332, 334 (Tex. Crim. App. 1985) (to bar the admission of a prior conviction because the defendant was without assistance of counsel, the burden is on the defendant to prove that he was indigent, without counsel, and did not voluntarily waive the right to counsel); *Taylor v. State,* 470 S.W.2d 663, 663-64 (Tex. Crim. App. 1971) (no error in penalty-stage admission of certified copies of judgment that were silent as to whether defendant had been represented by counsel where no objection was made to admission of documents and "no claim [was] advanced . . . that at the time of such conviction the appellant was indigent, without counsel and did not waive the right of counsel, or that he was deprived of counsel in any manner").

[98] TEX. R. APP. P. 44.2(b); *see Orsag v. State*, 312 S.W.3d 105, 122 (Tex. App.–Houston [14th Dist.] 2010, pet. ref'd) (assuming admission of certified reset forms from prior DWI convictions was error, it was harmless under Rule 44.2(b)); *Johnson v. State*, No. 01-02-00861-CR, 2003 WL 21666109, *3 (Tex. App.–Houston [1st Dist.] 2003, no pet.) (not designated for publication) (error in admitting judgment and sentence of prior misdemeanor theft conviction into evidence after defendant admitted the prior conviction was harmless).

[99] *See Coleman v. State*, 246 S.W.3d 76, 81 (Tex. Crim. App. 2008); *State ex rel. Eidson v. Edwards*, 793 S.W.2d 1, 5 (Tex. Crim. App. 1990).

selection of death as one of the punishment options was made before the hiring of former counsel, and (5) the appearance of impropriety in the due process of this case.[100]  Appellant makes no further argument concerning this claim; he does not, for example, take issue with the evidence that shows that the Dallas District Attorneys' Office created a "Chinese wall" between appellant's former counsel and the prosecutors who tried this case, nor does he suggest that his former counsel ever conveyed any information about him to anyone in that D.A.'s office.  Under these circumstances,  we are unpersuaded that his case should be treated differently than other cases under the law.  We overrule this point of error.

In his twenty-fifth point of error, appellant asserts that the administrative judge erred in granting the State's motion to recuse the elected judge of the district court because she had granted appellant's motions concerning the constitutionality of the Texas death-penalty statute.  But appellant does not discuss Rule 18a of the Texas Rules of Civil Procedure which governs the recusal of trial judges.  That rule provides that "[a]n order granting a motion to recuse is final and cannot be reviewed by appeal, mandamus, or otherwise."[101]  We have already held that a motion to recuse that is *granted* at the trial level is non-reviewable, although the *denial* of such a motion to recuse is reviewable on appeal.[102]  Thus, appellant has no right of review under the recusal rules.  Appellant also claims that the recusal of the

---

[100] Appellant's Brief at 114.

[101] TEX. R. CIV. P. 18a(j)(1)(B).

[102] TEX. R. CIV. P. 18a(j)(1)(A); *Gaal v. State*, 332 S.W.3d 448, 456-57 (Tex. Crim. App. 2011).

elected judge violated his due process rights, but he does not point to anywhere in the record where he objected on this basis, and we cannot find any such objection. Therefore, this constitutional claim is forfeited.[103] We overrule appellant's twenty-fifth point of error.

In his twenty-sixth point of error, appellant claims that the trial judge erred in not granting his request to videotape the voir dire proceedings. Appellant cites no statute or case law that requires any such action. He admits that, in *Massey v. State*,[104] we held that the trial judge does not abuse his discretion in refusing to allow videotaping of voir dire proceedings. Appellant fails to persuade us that we should "find an exception" to that case for him or that we should jettison *Massey*. We overrule this point of error.

In his twenty-seventh point of error, appellant claims that the trial judge erred in not permitting him to inform prospective jurors that the judge would assess a life sentence if the jury is unable to reach a verdict on either of the special issues. He acknowledges that his "request is directly opposite the statutory prohibition against telling the jury" about the consequence of their failure to agree.[105] He also requests that we reconsider our holding in

---

[103] *Fuller v. State*, 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("[A]lmost all error—even constitutional error—may be forfeited if the appellant failed to object"); *Anderson v. State*, 301 S.W.3d 276, 280 (Tex. Crim. App. 2009) ("Indeed, our prior decisions make clear that numerous constitutional rights, including those that implicate a defendant's due process rights, may be forfeited for purposes of appellate review unless properly preserved."); *Briggs v. State,* 789 S.W.2d 918, 924 (Tex. Crim. App. 1990) (holding errors based on the constitutional rights to confrontation and due process may be waived by failure to object at trial).

[104] 933 S.W.2d 141, 151 (Tex. Crim. App. 1996).

[105] Appellant's Brief at 117.

*Nobles v. State*,[106] in which we rejected appellant's claim. We decline to reconsider our prior holding, and we overrule appellant's twenty-seventh point of error.

Starting with his point of error twenty-eight, appellant lists a series of claims that he calls "Constitutional Issues Attacking the Texas Death Penalty Statute and Scheme" and explains that he raises them (1) in the hope that we might reconsider our precedent overruling each of these issues and (2) to preserve them for further review in federal court.

In points twenty-nine through thirty-one, appellant argues that the Texas sentencing scheme violates *Apprendi v. New Jersey*[107] and *Ring v. Arizona*[108] because its mitigation charge does not assign the burden of proof to the State. He also argues that this defect violates Article I, section 10 of the Texas Constitution. We have repeatedly rejected this claim and do so again today.[109]

In point thirty-two, appellant argues that the "10-12" rule[110] confuses the jury, in violation of the Eighth Amendment. We have previously rejected this argument.[111]

---

[106] 843 S.W.2d 503, 508-09 (Tex. Crim. App. 1992).

[107] 530 U.S. 466 (2000).

[108] 536 U.S. 584 (2002).

[109] *Saldano v. State*, 232 S.W.3d 77, 107-09 (Tex. Crim. App. 2007); *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005);  *Resendiz v. State*, 112 S.W.3d 541, 549-50 (Tex. Crim. App. 2003).

[110] TEX. CODE CRIM. PROC. art. 37.071 §§ 2(d)(2) & 2(f)(2).

[111] *Leza v. State*, 351 S.W.3d 344, 361-62 (Tex. Crim. App.  2011); *Russeau*, 171 S.W.3d at 886.

In point thirty-three, appellant argues that the trial court did not define the terms "probability," "continuing threat to society," and "criminal acts of violence" in its jury charge on the two statutory special issues, violating the constitutional requirement that each aggravating circumstance narrow the class of persons eligible for the death penalty. "There is no error in omitting the definition of a word used in the statute when the word is used in its ordinary sense and is easily comprehended by everyone."[112] Because these terms are common and easily understood, we have repeatedly rejected this claim.[113]

In point thirty-four, appellant argues that Article 37.071 fails to mandate that the jury consider specific evidence mitigating. We have previously rejected this argument.[114]

In points twenty-eight and thirty-five through thirty-seven, appellant argues that the special issues in Articles 37.071 and 37.0711 fail to provide guidance to juries, thus allowing for unlimited juror discretion in imposing the death penalty. He also argues that the arbitrariness of these factors prevent this Court from conducting meaningful appellate review. This Court has rejected claims that the Texas death penalty sentencing procedure allows for open-ended, unstructured discretion.[115]

---

[112] *Resendiz*, 112 S.W.3d at 550 (citing *Russell v. State*, 665 S.W.2d 771, 780 (Tex. Crim. App. 1983)).

[113] *Leza*, 351 S.W.3d at 362; *Russeau v. State,* 291 S.W.3d 426, 434-35 (Tex. Crim. App. 2009).

[114] *Busby v. State*, 253 S.W.3d 661, 667 (Tex. Crim. App. 2008).

[115] *See, e.g., Saldano v. State*, 232 S.W.3d at 104-09; *Turner v. State*, 87 S.W.3d 111, 118 (Tex. Crim. App. 2002); *Sells v. State*; 121 S.W.3d 748, 767-68 (Tex. Crim. App. 2003).

In point thirty-eight, appellant claims that the trial judge erred in overruling his motion to quash the indictment, which had alleged numerous constitutional defects in the Texas death-penalty law. We reject this point of error as multifarious[116] and inadequately briefed.

In points thirty-nine and forty, appellant argues that the cumulative effect of the constitutional violations in the Texas penalty procedure denied him due process of the law under the United States and the Texas Constitution. Because we overrule each of appellant's points of error concerning the death-penalty statute, we likewise overrule his arguments regarding their cumulative effect.

Having found that none of appellant's forty claims demonstrate reversible error, we affirm the trial judge's judgment and sentence.

Delivered:  May 21, 2014
Do Not Publish

---

[116] Appellant alleges eleven separate constitutional violations in a single point of error.